# In the United States Court of Federal Claims

No. 12-898C

(Filed: August 20, 2015)

| | | |
|---|---|---|
| ********************************** | | |
| **SIKORSKY AIRCRAFT CORPORATION,** <br> **Plaintiff,** <br> **v.** <br> **UNITED STATES,** <br> **Defendant.** | ) | Second litigation over a contractor's compliance with Cost Accounting Standards pertinent to indirect materiel overhead costs; government's "alternative" claim to that litigated to final judgment in the prior action; applicability of the doctrine of claim preclusion |
| ********************************** | | |

Jeffrey A. Hall, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, Illinois, for plaintiff. Of counsel were Katherine M. Swift, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, and Karen L. Manos, Gibson, Dunn & Crutcher LLP, Washington, D.C.

James W. Poirier, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This action concerns the accounting practices of plaintiff, Sikorsky Aircraft Corporation ("Sikorsky"), a government contractor, and is a reprise of a prior dispute between Sikorsky and the United States ("the government") over those practices. At this juncture, the question before the court is whether the doctrine of claim preclusion bars the government from presenting an "alternative" claim to that litigated to final judgment in the first action.

At issue in the first case was whether Sikorsky's accounting practices were in compliance with the Cost Accounting Standards ("CAS") set out at 48 C.F.R. Chapter 99, Subchapter B, Part 9904, particularly those at 48 C.F.R. §§ 9904.418 to 9904.418-63 ("CAS 418"). Between 1999 and 2005 Sikorsky allocated its materiel overhead costs to contracts with both the government and commercial customers using a direct labor base. The government's contracting officer issued a final decision on December 11, 2008, finding that Sikorsky's allocations during that

time were not in compliance with CAS 418 and asserting a claim against Sikorsky for about $80 million in combined principal and interest.[1] Sikorsky timely challenged that determination in this court in accord with provisions of the Contract Disputes Act, now codified at 41 U.S.C. § 7104, as incorporated into the Tucker Act, 28 U.S.C. § 1491(a)(2).[2] In a decision dated March 22, 2013, the court held that the government had failed to establish by preponderant evidence that Sikorsky had violated CAS 418, *see Sikorsky Aircraft Corp. v. United States*, 110 Fed. Cl. 210, 214 (2013) ("*Sikorsky IV*"), and the Federal Circuit subsequently affirmed the court's judgment, *see Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2014) ("*Sikorsky VI*").

During the course of that litigation, on December 21, 2011, a contracting officer issued a further "alternative" final decision asserting a second claim related to Sikorsky's indirect-cost-allocation methods. Specifically, the contracting officer claimed that even if Sikorsky's accounting practices from 1999 through 2005 were deemed compliant with CAS 418, a change adopted in 2006 to its accounting for materiel overhead should have been processed as a unilateral change, and demanded that Sikorsky pay approximately $34 million, including interest, to the government. On December 20, 2012, Sikorsky filed suit in this court to challenge the validity of the government's alternative claim.

The case is now before the court on Sikorsky's motion for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"). *See* Sikorsky's Mem. Supporting Its Mot. for Judgment on the Pleadings ("Pl.'s Mot."), ECF No. 21.[3] Sikorsky

---

[1]CAS 418, discussed *infra*, sets out how contractors may distribute indirect costs, such as overhead, relating to their government contracts. *See* 48 C.F.R. §§ 9904.418-20, 9904.418-50.

[2]As amended, the Tucker Act provides in pertinent part that

> *[t]he Court of Federal Claims shall have jurisdiction* to render judgment *upon any claim* by or *against*, or dispute with, *a contractor* arising under section 7104(b)(1) of title 41, including a dispute *concerning* termination of a contract, rights in tangible or intangible property, *compliance with cost accounting standards*, and any other nonmonetary disputes *on which a decision of the contracting officer has been issued* under section 6 of that Act [*sic*, now 41 U.S.C. § 7103].

28 U.S.C. § 1491(a)(2) (emphasis added). Paragraph (b)(1) of Section 7104 specifies that "a contractor may bring an action directly on [a] claim in the United States Court of Federal claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1). Paragraph (a)(3) of Section 7103 states that "[e]ach claim by the [f]ederal [g]overnment against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3).

[3]In deciding this motion, the court may consider, *inter alia*, prior court decisions and other public records. *See Curtin v. United States*, 91 Fed. Cl. 683, 686 (2010) ("When deciding a motion for judgment on the pleadings, the court may review 'the content of the competing

avers that the government's claim is precluded because common transactional facts appertain to the government's 2008 claim for noncompliance and its alternative 2011 claim now at issue. *See* Sikorsky's Reply Supporting Its Mot. for Judgment on the Pleadings ("Pl.'s Reply"), ECF No. 29. The government resists Sikorsky's motion, arguing that the timing of its alternative 2011 claim renders claim preclusion inapplicable. *See* Def.'s Response to Pl.'s Mot. for Judgment on the Pleadings ("Def.'s Opp'n"), ECF No. 25.

## BACKGROUND[4]

Sikorsky holds a number of contracts with the government and commercial customers to furnish aircraft and spare parts. Compl. ¶ 11; *see also Sikorsky Aircraft Corp. v. United States*, 102 Fed. Cl. 38, 40 (2011) ("*Sikorsky I*"). The dispute between the parties stems from Sikorsky's method for allocating its materiel overhead costs. Compl. ¶ 12; *see also* 48 C.F.R. § 9904.418-50.[5] This court conducted a detailed canvass of the applicable regulations and established facts in this case. *See Sikorsky I*, 102 Fed. Cl. 38; *Sikorsky Aircraft Corp. v. United States*, 105 Fed. Cl. 657, 661 (2012) ("*Sikorsky II*"); *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571 (2012) ("*Sikorsky III*"); *Sikorsky IV*, 110 Fed. Cl. 210; *Sikorsky Aircraft Corp. v. United States*, 112 Fed. Cl. 313 (2013) ("*Sikorsky V*"). Presuming familiarity with the series of prior opinions, the court will provide only a summary of the regulatory framework and factual background constituting the context for the pending motion.

---

pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice.'") (alteration in original) (quoting *Crusan v. United States*, 86 Fed. Cl. 415, 417 (2009), *aff'd*, 374 Fed. Appx. 18 (Fed. Cir. 2009) (in turn citing 5C Wright & Miller, *Federal Practice and Procedure* § 1367 (2008))); *see also Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 259 (2013) ("[I]n deciding whether to dismiss a complaint upon the basis of claim preclusion or *res judicata* under RCFC 12(b)(6), this court can consider prior court decisions and court filings between the same parties, which are matters of public record.") (citations omitted).

[4]The recitation of facts is drawn from the pleadings in this case and the findings of fact and rulings on mixed questions of fact and law set out in the prior decision in *Sikorsky IV*, 110 Fed. Cl. 210.

[5]CAS 418, and particularly 48 C.F.R. §§ 9904.418.50(d) and (e), can be confusing at first because the text uses the word "material" in two different ways—first as an adjective and then as a noun. To clarify description and analysis, the court has used "materiel" as a noun to refer to aircraft components, and "material" as an adjective to indicate significance. *See Sikorsky I*, 102 Fed. Cl. at 43 n.7 ("'Material' is an adjective meaning significant, and in the second usage, 'material' means components or supplies, and is equivalent to the noun 'materiel.'").

**A. *Cost Accounting Standards***

The CAS are a set of nineteen cost-accounting criteria promulgated by the Cost Accounting Standards Board ("CASB"). *Sikorsky I*, 102 Fed. Cl. at 41; *see also* Compl. ¶¶ 34-38. Since its inception, the CASB has had "exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, . . . [which govern] measurement, assignment, and allocation of costs to contracts with the [f]ederal [g]overnment." 41 U.S.C. § 1502; *see also* 48 C.F.R. §§ 9900.000 to 9904.420-63; *see generally* Darrell J. Oyer, *Accounting for Government Contracts-Cost Accounting Standards* §§ 1.01 to 1.05 (2010). Pertinent to Sikorsky's motion is CAS 418 governing the "[a]llocation of [d]irect and [in]direct costs." 48 C.F.R. § 9904.418-20. More specifically, CAS 418 recites accounting practices for "consistent determination of direct and indirect costs," "the accumulation of indirect costs . . . in indirect cost pools," and "the selection of allocation measures based on the beneficial or causal relationship between an indirect cost pool and cost objectives." *Id*.[6]

**B. *Sikorsky's Accounting Practices, Audits, and Reviews***

Materiel overhead costs are types of indirect costs; they consist of the costs to purchase materiel used by Sikorsky to manufacture and assemble aircraft and spare parts, store the materiel in warehouses, and supply the materiel to the manufacturing labor. *See Sikorsky IV*, 110 Fed. Cl. at 215-16. Sikorsky allocates materiel overhead costs to both government and commercial contracts. *See* Compl. ¶ 12. Prior to 1999, Sikorsky allocated materiel overhead costs using a hybrid allocation base of direct materiel costs less the costs of commercial aircraft engines and used helicopters. Compl. ¶ 6. The commercial costs were removed from the calculus "to compensate for the exclusion of [government furnished materiel ('GFM')] from the direct materiel cost base." *Sikorsky VI*, 773 F.3d at 1319.[7] In 1998, Sikorsky concluded that its

[6]A direct cost is "any cost which is identified specifically with a particular final cost objective[, *e.g.*, a contract]. . . . Costs identified specifically with a contract are direct costs of that contract." 48 C.F.R. § 9904.418-30(a)(2). Relatedly, an indirect cost is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." 48 C.F.R. § 9904.418-30(a)(3). Direct and indirect costs are both allocated to cost objectives. *Id.* Indirect costs accumulate in indirect cost pools, *see Sikorsky I*, 102 Fed. Cl. at 42, and are apportioned according to an allocation method that guides how the cost will be distributed among multiple cost objectives, *see Sikorsky IV*, 110 Fed. Cl. at 214; *see also Sikorsky VI*, 773 F.3d at 1318 ("The allocation base allows measurement of the quantity of costs in an indirect pool attributable to a given cost objective."). CAS 418-50 provides a framework for acceptable allocation methods. 48 C.F.R. § 9904.418-50.

[7]GFM includes aircraft components, such as engines and other high-dollar items, which the government purchases from other manufacturers and provides to Sikorsky at no cost. Compl. ¶ 16. Sikorsky is prohibited from assigning a value to this GFM. Compl. ¶ 16. Consequently, Sikorsky's materiel costs omit all GFM used in government aircraft. Compl. ¶ 16. However, similar components in Sikorsky's commercial aircraft were assigned a value at full cost and were therefore reflected in the company's direct materiel costs. Compl. ¶ 16.

allocation method only partially mitigated the GFM distortion. *See* Compl. ¶ 19. "Sikorsky officials felt that the pre-1999 compromise was not entirely effective because the company used substantial amounts of GFM beyond engines, and the removal of the cost of commercial engines from the base did not deal with the remaining GF[M] that [Sikorsky] still [had] in [its] factory that [was] still being handled and moved around and not receiving any allocations." *Sikorsky IV*, 110 Fed. Cl. at 216 (alteration in original) (citations and quotations omitted). To avoid the perceived distortions caused by the substantial volume of GFM, starting in January 1, 1999, Sikorsky began allocating indirect materiel costs by using a direct labor cost base. Compl. ¶ 19. Sikorsky alerted the government to "these accounting changes before they took effect, submitting a revised cost-accounting Disclosure Statement to Ms. [Joan] Sherwood, then its C[orporate Administrative Contracting Officer ('CACO')], on August 12, 1998." *Sikorsky IV*, 110 Fed. Cl. at 216.[8] Ms. Sherwood approved the use of the direct labor cost base but provided the caveat that this method for allocating materiel overhead costs would be continually monitored for compliance with CAS 418. Compl. ¶ 20.

On October 29, 2004, the Defense Contract Audit Agency ("DCAA") issued its final report for an audit that began in August 2002. Compl. ¶¶ 21-22. The report, principally authored by Robert Boyer, determined "that Sikorsky's use of a direct labor cost base to allocate materiel overhead was 'in potential noncompliance' with CAS 418 . . . and that Sikorsky was in fact 'in noncompliance with CAS 418' during the calendar year 2003." *Sikorsky IV*, 110 Fed. Cl. at 218 (quoting 2004 Final Audit Report). The materiality of the potential noncompliance was not addressed in the final report, and although Sikorsky did not believe that its accounting method was noncompliant with CAS 418, it changed its method of materiel overhead allocation as part of a broader accounting overhaul scheduled to go in effect on January 1, 2006. *Id.*; *see also* Compl. ¶¶ 22, 25. Under the revised accounting method, Sikorsky established a new materiel overhead pool and allocated that pool according to a base of direct materiel costs less the costs of commercial engines. *See Sikorsky IV*, 110 Fed. Cl. at 218; *see also* Compl. ¶ 27.[9] Sikorsky discussed the changes with CACO Edward Weisman, who had succeeded Ms. Sherwood, and he approved the changes in February 2006, identifying the accounting method's compliance with the applicable CAS. *See Sikorsky IV*, 110 Fed. Cl. at 218; *see also* Compl. ¶ 27. The discussions between CACO Weisman and Sikorsky encompassed both DCAA's 2004 audit report finding Sikorsky in compliance with CAS 418 and Sikorsky's newly proposed system. *See Sikorsky IV*, 110 Fed. Cl. at 218.

### C. *Government's 2008 Claim for Noncompliance*

In 2007, Frank Colandro, who succeeded Mr. Weisman as Sikorsky's CACO, became aware of Sikorsky's audit from 2004 that found the accounting practices from 1999 to 2005 to be potentially noncompliant with CAS 418. *See* Compl. ¶ 28-29. Mr. Colandro subsequently

[8]Ms. Sherwood was an official with the Defense Contract Management Agency ("DCMA"). *See Sikorsky IV*, 110 Fed. Cl. at 214 n.8.

[9]The new materiel overhead pool "included purchasing, receiving, inspection, and supplier quality costs, but not materiel handling costs, which remained in the manufacturing overhead pools." *Sikorsky IV*, 110 Fed. Cl. at 218.

submitted a notice of potential noncompliance to Sikorsky in March 2007 and issued a final decision against Sikorsky on December 11, 2008. Compl. ¶¶ 28-29; *see also* Pl.'s Reply Ex. A, at 1-3 (Letter from Colandro to Joseph Chancio, Sikorsky's former Assistant Controller, Government Accounting (Dec. 11, 2008)). The 2008 final decision claimed that "the manner in which [Sikorsky] allocated [m]ateri[e]l [o]perations expenses to final cost objectives using a base of direct labor [from 1999 through 2005] did not comply with CAS 418," and stated that Sikorsky's alleged noncompliance practice "ceased" by the change in 2006. Pl.'s Reply Ex. A, at 1-2; *see also* Def's Reply to Pl.'s Response to Def.'s Mot. for Leave to Serve Interroggs. at 7, ECF No. 74 in No. 09-844C, the first *Sikorsky* action ("[T]he amended allocation base for materi[e]l overhead costs set forth in . . . 2006" "corrects the noncompliance"). Based on Sikorsky's alleged noncompliance, the contracting officer asserted a claim against the company for about $80 million ($65 million in principal plus $15 million in interest). Compl. ¶¶ 28-29.[10]

On December 8, 2009, Sikorsky filed suit challenging the CACO's determination. Compl. ¶ 30. The complaint contended that the 2008 final decision was null and of no effect, and that Sikorsky's challenged allocation method was in compliance with CAS 418. *See Sikorsky I*, 102 Fed. Cl. at 40. Sikorsky also pleaded various defenses, *viz.*, accord and satisfaction, waiver, laches, and statute of limitations. *See id.*[11] The government filed its answer and counterclaim on May 4, 2010, alleging that Sikorsky had violated CAS 418 through its materiel overhead accounting method from 1999 through 2005 and seeking the same $80 million that Sikorsky was said to owe. *See* Compl. ¶ 30. Seven months after Sikorsky filed its complaint, the Federal Circuit issued a decision in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010). In light of the court of appeals' holding in that case, and out of abundance of caution, Sikorsky filed a second claim with its contracting officer seeking a decision regarding the merits of the affirmative defenses it had previously raised. *See Sikorsky I*, 102 Fed. Cl. at 40. The contracting officer rejected the claim with respect to those defenses, stating that he lacked authority to act because of the related litigation in this court. *See id.* Sikorsky considered the contracting officer's response to be a denial of its claims and subsequently brought a second suit seeking review of the denial and asserting its affirmative defenses anew. *See id*. (referring to No. 10-741C, the second *Sikorsky* action). The court consolidated the two cases on November 19, 2010. *See* Order of Nov. 19, 2010, ECF No. 26 in No. 09-844C.

---

[10]The 2008 final decision had not been approved by a DCMA review board; instead, this administrative step was waived because DCMA "was concerned that it would not be able to assert its claim against Sikorsky within the C[ontract Disputes Act]'s prescribed statute of limitations." *Sikorsky IV*, 110 Fed. Cl. at 219.

[11]Sikorsky's accord-and-satisfaction affirmative defense was premised on an allegation that in response to the 2004 audit showing a potential noncompliance, Sikorsky negotiated an agreement with the government, in which the government "agreed to consider the non[-] compliance issue resolved in exchange for Sikorsky's decision to change its accounting practice going forward." *Sikorsky II*, 105 Fed. Cl. at 674; *see also* Pl.'s Reply at 3 ("Sikorsky . . . contended that the 2006 change was the product of an agreement with the government to resolve the claim.") (citing Compl. ¶¶ 61-64 in No. 09-844C).

The government never answered Sikorsky's second complaint. Instead, on December 27, 2010, the government filed a motion to dismiss the second complaint on the ground that the juridical prerequisite of a contracting officer's final decision had not been met for Case No. 10-741C, the second action. *See Sikorsky I*, 102 Fed. Cl. at 47. The government's motion was denied on November 30, 2011. *See id.* at 47-48 & n.14. In February 2012, the government filed motions for summary judgment on Sikorsky's affirmative defenses based upon statute of limitations and accord and satisfaction. *See Sikorsky II*, 105 Fed. Cl. at 660. On July 18, 2012, the court found that genuine issues of material fact precluded summary judgment on those two affirmative defenses. *See id.* at 674, 678 (holding that genuine factual issues existed relating to the accrual of the government's claim and respecting the parties' accord and satisfaction entered by and between Sikorsky and the contracting officer attendant to the 2006 accounting change). The court thereafter held a five-day trial on the merits of the government's CAS-noncompliance claim and Sikorsky's statute-of-limitations defense. *See Sikorsky IV*, 110 Fed. Cl. at 213.[12] In March 2013, this court held that the government's claim was timely but that the government had failed to establish by a preponderance of the evidence that Sikorsky had violated CAS 418. *See id*. at 210. The Federal Circuit affirmed on the merits in December 2014. *See Sikorsky VI*, 773 F.3d 1315.

### D. *Government's Alternative 2011 Claim*

During the pendency of the litigation over the government's 2008 claim, a new CACO, DCMA contracting officer Mark Sadlon, who had replaced Frank Colandro, issued a further final decision on December 21, 2011, asserting a claim related to Sikorsky's materiel overhead costs during 2006 and thereafter. Pl.'s Mot. Ex. A (Letter from Mark Sadlon to Chancio (Dec. 21, 2011)). In his 2011 final decision, Mr. Sadlon "explicitly acknowledg[ed] that this second claim constitute[d] an '*alternative*' to the government's CAS 418 claim as to Sikorsky's 1999-2005 materiel overhead accounting method." Pl.'s Mot. at 5 (emphasis added) (citing Compl. ¶ 47; Pl.'s Mot. Ex. A). In Mr. Sadlon's view, "Sikorsky made a change from one compliant [materiel overhead] accounting practice to another compliant [materiel overhead] accounting practice, which is the definition of a unilateral accounting practice change [as set forth in] CAS 201-6(b)(2)." Pl.'s Mot. Ex. A, at 5.[13] He therefore claimed that if "Sikorsky's 1999-2005 [materiel

---

[12]The accord-and-satisfaction issue was not tried with the CAS-applicability and statute-of-limitations issues because the court determined that "resolution of these two consolidated cases [wa]s possible without reaching the accord-and-satisfaction defense." *Sikorsky IV*, 110 Fed. Cl. at 213 n.2.

[13]A unilateral accounting practice change is defined in the CAS as "a change in cost accounting practice from one compliant practice to another compliant practice that a contractor with a CAS-covered contract(s) elects to make that has not been deemed desirable by the cognizant [f]ederal agency official and for which the [g]overnment will pay no aggregate increased costs." 48 C.F.R. § 9903.201-6(b)(2) (incorporated in Federal Acquisition Regulation 48 C.F.R. ["FAR"] § 52.230-6). A further provision of the FAR specifies the method for determining the cost impact of a unilateral accounting change. *See* FAR § 30.604(h). The FAR also provides that "a contracting officer shall not combine the cost impacts of several unilateral

overhead] accounting practice is determined to have been compliant with CAS 418, then Sikorsky's January 1, 2006 [materiel overhead] accounting practice change should [have] be[en] processed as a 'unilateral' accounting practice change pursuant to the CAS clause, 48 C.F.R. §§ 9903.201-4, FAR 52.230-2, and FAR 52.230-6." *Id.* Ex. A, at 1.[14] In effect, the contracting officer concluded that "the 1999-2005 method was *compliant* with CAS 418, and that the 2006 change was a 'voluntary' change." Pl.'s Reply at 4 (emphasis in original) (citations omitted). The contracting officer demanded that Sikorsky pay the government more than $34 million in principal and interest on this "alternative claim" and identified Contract No. DAAH23-02-C-006, referred to as the Multi-Year VI contract ("The Multi-Year Contract" or "the contract") between Sikorsky and the government as a representative contract. *Id.*; *see also* Compl. ¶ 53.[15] The contract, executed in September 2002, was also the representative contract cited in the 2008 final decision. *See* Compl. ¶ 77 in No. 09-844C ("The [g]overnment['s] demand of almost $80 million includes increased costs that the [g]overnment claims to have paid under contracts it awarded . . . including Contract No. DAAH23-02-C-0006, the Multi-Year VI [C]ontract.").

Sikorsky challenged the 2011 final decision on the alternative claim by filing a complaint in this court on December 20, 2012. Sikorsky's complaint sets out eight counts against the government. *See* Compl.[16] The government subsequently counterclaimed on March 4, 2013,

---

accounting changes unless all of the cost impacts are increased costs to the [g]overnment." Pl.'s Mot. Ex. A, at 4 (citing FAR § 30.606(a)(3)(ii)).

[14]Subparagraph (a)(4)(ii) of CAS 201-4 addresses "unilateral" (previously called "voluntary") practice changes. It requires a contractor to

> [n]egotiate with the [c]ontracting [o]fficer to determine the terms and conditions under which a change may be made to a cost accounting practice, other than a change made under other provisions of subparagraph (a)(4) of this clause; provided that no agreement may be made under this provision that will increase costs paid by the United States.

48 C.F.R. § 9903.201-4(a)(4)(ii) (incorporated in FAR § 52.230-2).

[15]The Multi-Year Contract is a fixed-year and price contract for the sale of particular helicopters to the United States Army and Navy. Compl. ¶ 53.

[16]The counts set forth in the complaint draw upon the context presented in both the 2008 and 2011 claims made by the government: Count I – the contracting officer had no authority to issue another final decision while litigation was pending on the 2008 claim; Count II – the contracting officer lacked authority to issue a final decision claiming that Sikorsky's pre-2006 practice was both noncompliant and compliant with CAS 418; Count III – the government's claim asserted in the 2011 final decision constituted a compulsory counterclaim in the then-pending litigation and is barred because it was not brought in that litigation; Count IV – the 2011 final decision asserting an alternative claim is barred by the doctrine of claim preclusion; Count V – it was erroneous for the contracting officer to conclude that the materiel overhead accounting change in 2006 was a "unilateral change" for purposes of 48 C.F.R. § 52.230-6;

seeking to recover the amount of the CACO's 2011 final decision. *See* Def.'s Answer and Counterclaim ("Counterclaim") ¶ 142, ECF No. 13 ("Plaintiff is liable to the United States for an immediate payment of $26,554,660.00, plus interest, or such other amount as may be demonstrated at trial.").

On April 24, 2015, Sikorsky filed a motion for judgment on the pleadings pursuant to RCFC 12(c). *See* Pl.'s Mot. This motion draws upon Count IV of Sikorsky's complaint, *i.e.*, the preclusive effect of the final judgment in the previous litigation. *See id*. at 10-12; Pl.'s Reply at 2-11; Compl. ¶¶ 67-70.[17] Sikorsky's motion has been fully briefed,[18] and it was addressed at a hearing held on August 18, 2015. The case is now ready for disposition.

## STANDARDS FOR DECISION

### A. *Judgment on the Pleadings*

RCFC 12(c) is identical to Federal Rule of Civil Procedure 12(c) and provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." RCFC 12(c). On a motion under Rule 12(c), the court must assume "each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant." *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988). After drawing all reasonable inferences from the factual allegations contained in the complaint, judgment on the pleadings is proper when "there are no material facts in dispute and the [movant] is entitled to judgment as a matter of law." *RQ Squared, LLC v. United States*, 119 Fed. Cl. 751, 757 (2015) (citing *New Zealand Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994)); *see also Forest Labs., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

---

Count VI – in the event that the materiel overhead change is found to be "unilateral," then Sikorsky is entitled to an equitable adjustment in the amount to offset the government's demand under the 2011 final decision; Count VII – the 2006 change was a "desirable" adjustment to correct an alleged noncompliance with the CAS; and Count VIII – any cost impact of the 2006 change should be limited to "aggregate increased costs." *See* Compl. ¶¶ 54-95.

[17] In addition to raising the ground of claim-preclusion in its motion, Sikorsky also moved for judgment on the pleadings based on the government's alleged failure to assert a compulsory counterclaim in the previous litigation (Count III). *See* Pl.'s Mot. at 7-10. This defense contends that the government's counterclaim was compulsory. The court finds it unnecessary to reach the merits of this argument and therefore declines to address it. The defense is preserved and not waived, as are the other defenses asserted in the complaint. *See id.* at 6 n.5 (citing RCFC 12(h)).

[18] After the government filed its response to Sikorsky's motion, the court invited the parties to address in further briefing the application of the claim preclusion doctrine as explicated in *Bowers Inv. Co. v. United States*, 695 F.3d 1380 (Fed. Cir. 2012). *See* Order of June 18, 2015, ECF No. 26. The parties then filed their answering briefs. *See* Pl.'s Reply; Def.'s Sur-Reply to Pl.'s Mot. for Judgment on the Pleadings ("Def.'s Surreply"), ECF No. 31.

Sikorsky's complaint in this case sets out defenses to the government's claim, which is the reverse of the posture of a typical complaint that initiates litigation. Consequently, the court looks to Sikorsky's defenses as it would those raised by a defendant's motion in a standard case. In that respect, when considering a motion under RCFC 12(c), the court applies substantially the same test as it does for a motion to dismiss for failure to state a claim under RCFC 12(b)(6). *See Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("When reviewing a decision of the Court of Federal Claims to grant judgment on the pleadings under RCFC 12(c), 'we apply the same standard of review as a case dismissed pursuant to Rule 12(b)(6) . . . .'") (quoting *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009)); *see also Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005) ("The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss.").

As a starting point, factual allegations set forth in the complaint regarding the claimed defenses must be enough to raise a right to relief above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The court must inquire whether the complaint "plausibly suggest[s] (not merely [is] consistent with)" a showing of entitlement to relief. *Cary*, 552 F.3d at 1376 (citing *Twombly*, 550 U.S. at 557). Further, the court must not "accept as true a legal conclusion couched as a factual allegation[, which is entitled to a favorable inference.]" *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citations omitted). While a plaintiff is not required to set out in detail the facts upon which the claim or defense is based, "[t]o survive a motion [of this nature], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief [here, a claimed defense] that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (emphasis added) (quoting *Twombly*, 550 U.S. at 570); *see also Henry Hous. Ltd. P'ship v. United States*, 95 Fed. Cl. 250, 254 (2010). Plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B. *Claim Preclusion*[19]

Under the doctrine of claim preclusion, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979). As the Supreme Court said in *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948):

[19]As a matter of nomenclature, this court shall use the term "claim preclusion" instead of the more general term "*res judicata*." *See Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984). While the term "*res judicata*" originally conveyed the concept of claim preclusion, *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 n.2 (Fed. Cir. 2008), it has evolved to include "any preclusion of litigation arising from a judgment, including collateral estoppel," *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 478 (Fed. Cir. 1991); *see also Acumed*, 525 F.3d at 1323 n.2 (citing *Restatement (Second) of Judgments*, Introductory Note before ch. 3 (1982) (discussing the terminology of *res judicata*); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 (2d ed. 2002) (same)).

> The rule [of claim preclusion] provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, *the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose*. *The judgment puts an end to the cause of action*, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment.

*Id.* (emphasis added) (citations and quotations omitted); *see also Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1053 (Fed. Cir. 2014) (claim preclusion bars relitigating "a claim, or cause of action, or any possible defense to the cause of action which is ended by a judgment of the court") (quoting *Nystrom v. Trex Co.*, 580 F.3d 1281, 1284-85 (Fed. Cir. 2009)). The doctrine therefore serves to "foreclose[] matters that, although never litigated or even raised, could have been advanced in an earlier suit." *Carson v. Department of Energy*, 398 F.3d 1369, 1375 n.8 (Fed. Cir. 2005); *see also Chapman Law Firm Co. v. United States*, 72 Fed. Cl. 14, 16 (2006) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that has not been litigated, because of a determination that it should have been advanced in an earlier suit.") (citing *Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368 (Fed. Cir. 2006) (in turn citing *Migra*, 465 U.S. at 77 n.1)). In that respect, it prevents a party from "split[ting] a cause of action into separate grounds of recovery and [then] rais[ing] the separate grounds in successive lawsuits." *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 619-20 (Fed. Cir. 1995) (citations omitted); *see, e.g.*, *Restatement (Second) of Judgments* § 24 cmt. d ("When a defendant is accused of successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action.").

For purposes of evaluating alleged claim preclusion, the court applies the following tripartite test: whether "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1324 (Fed. Cir. 2008) (quoting *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000)); *see also Phillips/May Corp. v. United States*, 524 F.3d 1264, 1268 (Fed. Cir. 2008). Regarding the third prong, a claim cannot be split from another claim that arises from the same series of transactional facts. *See Hyperion, Inc. v. United States*, 120 Fed. Cl. 504, 510 (2015); *Restatement (Second) of Judgments* § 24(2). The Federal Circuit in *Bowers* explained:

> Courts decide whether two claims involve the same transactional facts "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." In contract disputes, the rule

> has been refined to create a presumption that all claims arising from the same contract should be brought together.

695 F.3d at 1384 (citations omitted) (quoting *Phillips/May*, 524 F.3d at 1271 (in turn quoting *Restatement (Second) of Judgments* § 24(2))). These precepts are susceptible to exceptions, based upon temporal and jurisdictional limitations. *See Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010) ("The [claim preclusion] doctrine does not apply to new rights acquired during the action which might have been, but which were not, litigated."); *see also Restatement (Second) of Judgments* § 26(1)(c) (stating that a claim in a second action is not extinguished if the party "was unable to rely on a certain theory of the case . . . because of the limitations on the subject matter jurisdiction of the courts . . . and the [party] desires in the second action to rely on that theory . . . .").

## ANALYSIS

### A. *Claim Preclusion*

The first two requirements for claim preclusion are not in dispute. *See* Pl.'s Mot. at 10. Respecting prong one, the parties in this action are the same as those in the prior action. *Compare* Compl. in No. 09-844C, ¶¶ 12-13, *and* Compl. in No. 10-741C, ¶¶ 14-15, *with* Compl. in No. 12-898C, ¶¶ 1-2. For prong two, these same parties litigated to final judgment the government's claim that Sikorsky's materiel overhead accounting method was noncompliant with CAS 418. *See Sikorsky IV*, 110 Fed. Cl. 210, *aff'd*, *Sikorsky VI*, 773 F.3d 1315. As a result, the salient question concerns the third requirement, *i.e.*, whether the government's alternative claim is based on the same set of transactional facts as its first claim concerning CAS 418.

In the prior action, the government argued that Sikorsky's allocation method used from 1995 to 2005 violated CAS 418 and indicated that the accounting change in 2006 corrected the noncompliance. *See supra*, at 5-6. In the present action, the government again addresses these accounting methods, but characterizes them differently. *See* Counterclaim ¶¶ 98-141; *see also* Def.'s Opp'n at 4-5. The government now argues that the allocation method Sikorsky used during 1999 through 2005 was compliant with CAS 418 and that the change in 2006 was a "unilateral" change from one compliant practice to another. *See* Pl.'s Mot. Ex. A, at 5; *see also* Counterclaim ¶ 140. Sikorsky avers that "the transactional facts underlying the alternative claim are the 1999-2005 method and the 2006 change, including the appropriate characterization of the change." Pl.'s Reply at 4. It argues that the facts supporting both claims "are not merely 'related in time, space, origin, or motivation,' . . . they are essentially the same." *Id*. at 4-5 (quoting *Bowers*, 695 F.3d at 1384). In Sikorsky's view, the government's claims "would have formed 'a convenient trial unit,' and they satisfy the transactional test for claim preclusion set forth in *Bowers*." *Id.* at 2-4 (quoting *Bowers*, 695 F.3d at 1384); *see also* Pl.'s Mot. at 11-12. The government responds that the claim it raised in 2008 relating to noncompliance with CAS 418 and the alternative claim it raised in 2011 are based on different transactional facts because the claims involve different regulations, and the calculation for compensation due for the alleged unilateral change in 2006 is calculated differently from the calculation for compensation due for a change from a noncompliant practice. *See* Def.'s Opp'n at 6, 12-13; Def.'s Surreply at 5.

The government's argument is unavailing because "[a]ltering the theory of recovery does not create a new claim under the transactional approach." *Tindle v. United States*, 56 Fed. Cl. 337, 347 (2003); *see also Lyons v. United States*, 45 Fed. Cl. 399, 404 (1999). This rule, as stated in the *Restatement*, applies to situations where a party, "[h]aving been defeated on the merits on one action . . . attempts another action seeking the same or approximately the same relief[,] but adducing a different substantive law premise or ground." *Restatement (Second) of Judgments* § 25 cmt. d; *see also id*. § 25 illus. 8-9. For example, in *Lyons*, a military retiree brought separate actions against the government under different theories of recovery, but based on an "identical factual scenario." 45 Fed. Cl. at 403. The plaintiff had originally alleged that an alteration in his retirement status was invalid, but after being denied recovery on that ground, he filed a second lawsuit claiming that his discharge was invalid and involuntary. *Id.* at 401-02. The court held that claim preclusion barred the second action because "[c]hanging the theory of recovery does not form a new claim under the transactional approach. These remedies, and all other remedies which could have been alleged in the first action, are extinguished and may not be asserted in later claims." *Id.* at 404; *see also PCL Const. Servs., Inc. v. United States*, 84 Fed. Cl. 408, 422 (2008) ("[W]hile purporting to advance a new claim, [plaintiff] is merely advancing a different theory of recovery, and perhaps better developed evidence, for the same set of transactional facts."). In essence, claim preclusion will bar a party from relitigating different theories of recovery based on the same set of facts. Although the government argues that "[t]he non-compliance claim and the voluntary change claim are not the same claim," Def.'s Opp'n at 14; *see also* Def.'s Surreply at 5, that is irrelevant to the issue of whether "the second claim is based on the *same set of transactional facts* as the first claim" as found in the three-part test for claim preclusion, *Hyperion*, 120 Fed. Cl. at 510 (emphasis added).[20] The second claim does not

[20]In contending that the government's alternate claim is not the same as its original claim, the government suggests that the facts pertinent to the different theories diverge insofar as the amounts claimed are concerned. *See* Def.'s Surreply at 5 (citing *United States v. Haytian Republic*, 154 U.S. 118, 124 (1894)). *Haytian Republic* indeed applied the "same evidence" standard to a second suit involving the same parties. As the Supreme Court said in that case, the test "for . . . determining whether or not the causes of action should have been joined in one suit is whether the evidence necessary to prove one cause of action would establish the other." *Id*. at 125. This standard has been superseded, however, by evolving precedents. As the Supreme Court observed in 1983, 89 years after *Haytian Republic* was decided, "[d]efinitions of what constitutes 'the same cause of action' have not remained static over time." *Nevada v. United States*, 463 U.S. 110, 130 (1983) (comparing *Restatement of Judgments* § 61 (1942), *with Restatement (Second) of Judgments* § 24 (1982)).

In *Nevada*, the Supreme Court explained the evolution of the criteria for application of claim preclusion by reference to the change in the *Restatements*:

> Under the first Restatement of Judgments § 61 (1942), causes of action were to be deemed the same "if the evidence needed to sustain the second action would have sustained the first action." In the Restatement (Second) of Judgments (1982), a more pragmatic approach, one "not capable of a mathematically precise definition," was adopted. *Id*. § 24, comment b. Under this approach causes of actions are the same if they arise from the same "transaction;" whether they are

have to be the same claim, *i.e.*, based upon the same theory, as the first claim to be precluded. *See Restatement (Second) of Judgments* § 25(1) & cmt. d.

While the government's theory of recovery in this action is distinct from its earlier, litigated claim for noncompliance, the factual overlap between the two claims readily satisfies the transactional test explicated in *Bowers*. *See* 695 F.3d at 1384. The contracting officer himself emphasized the virtual identicality of the factual premises for both claims in stating that the claim made in December 2011 was an "alternative" to the claim raised in December 2008. *See* Pl.'s Mot. Ex. A, at 5; *see also* Pl.'s Mot. at 8-9. By "focus[ing] extensively on Sikorsky's 1999-2005 accounting method that was at issue in the CAS 418 case," Pl.'s Mot. at 8, as well as analyzing the reasons why Sikorsky changed its accounting method in 2006, *id.* at 9, the contracting officer acknowledged and acted upon the fact that the alternative claim came from the same series of transactional facts as the previous claim brought in 2008, *see id*. Ex. A, at 5; *see also* Pl.'s Reply at 4 ("The alternative-claim final decision devotes most of its factual discussion to statements about the *CAS 418* claim [from 2008].") (emphasis in original). The contracting officer also identified the same representative contract, *i.e.*, the Multi-Year Contract, for both claims. *Compare* Compl. ¶ 77 in No. 09-844C, *with* Pl.'s Mot. Ex. A, at 1, *and* Compl. ¶ 53 in No. 12-898C. Because both claims emerged from the same contract, they are presumed to "constitute the same claim," *Phillips/May*, 524 F.3d at 1272, and the match in circumstances supports application of the presumption.[21]

---

> products of the same "transaction" is to be determined by "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as unit conforms to the parties' expectations or business understanding or usage." *Id*. § 24.

*Nevada*, 463 U.S. at 130 n.12.

[21]The presumption "that claims arising out of the same contract constitute the same claim" is only a starting point in this analytical exercise. *Phillips/May*, 524 F.3d at 1272. That presumption may be overcome by a showing that the claims are not related. *Id.* For example, "a different rule may be applied on the excuse that the several obligations created by a single contract are *so far separable or divisible that each constitutes a separate claim or cause of action*." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 (2d ed. 2002) (emphasis added). In this instance, the government's claims were so closely related that the contracting officer considered that the second claim was an alternative to the first claim. *See supra*, at 7-8. And, contrary to the government's protestation at the hearing, *see* Hr'g Tr. 42:3-6 (Aug. 18, 2015) ("[T]he contractors['] bar would go crazy if anybody ever got serious about saying you can only bring one lawsuit per contract . . . ."), the court's application of a presumption does not impose a blanket prohibition on bringing multiple lawsuits under one contract. The Contract Disputes Act itself contemplates that more than one suit may be brought regarding disputes that have a divergent origin and basis under a contract, by providing a mechanism for consolidating those claims:

In sum, the three-part test for claim preclusion has been satisfied, and the government's alternative claim based on the 2011 final decision should be precluded, absent any temporal or jurisdictional limitations.

**B. *Exceptions***

1. *Temporal limitation.*

Even accepting that the factual scenarios underlying both claims are the same, the government avers that claim preclusion is inapplicable to the present action because the government could not have asserted the second claim "at the time the pleading was filed in the first case." Def.'s Opp'n at 9. Notably, even before the first litigation was initiated, the government could have raised the alternative claim because it had all the pertinent facts then before it. *See* Pl.'s Reply at 7 ("The government does not dispute that the alleged facts supporting the alternative claim occurred before the 2008 CAS 418 final decision."). Moreover, it also had the option to inject its alternative claim into the first action after Sikorsky filed its complaint in the first action. As the government observes, "*concurrent consideration* of an adjustment for a voluntary change and an adjustment for a change from a non-compliant practice is *neither prohibited nor required* by the regulations or contract provisions." Def.'s Surreply at 5 (emphasis in original). Nonetheless, the government relies on Federal Circuit precedent for the proposition that it "[was] not required to do" either of those things, *i.e.*, (1) raise the alternative claim concurrently with the first claim or otherwise assert it before that claim was litigated, or (2) inject the alternative claim into the litigation over the first claim. It argues that claim preclusion cannot "penalize a party for exercising the discretion granted by the rules of civil procedure." Def.'s Opp'n at 10 (citing *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010); *Florida Power & Light Co. v. United States*, 198 F.3d 1358, 1360 (Fed. Cir. 1999)). Sikorsky counters that the government has misapplied these precedents and that "[c]laim preclusion turns on when a claim arises, not when a party chooses to assert it." Pl.'s Reply at 10; *see also* Pl.'s Mot. 10-11.

The Federal Circuit in *Gillig* acknowledged that "[t]he doctrine of [claim preclusion] does not punish a plaintiff for exercising the option not to supplement the pleadings with an *after-acquired claim*." 602 F.3d at 1363 (emphasis added) (citing *Florida Power & Light*, 198

---

> (d) Consolidation.—If 2 or more actions arising from one contract are filed in the United States Court of Federal Claims and one or more agency boards, for the convenience of the parties or witnesses or in the interest of justice, the United States Court of Federal Claims may order the consolidation of the actions in that court or transfer any actions to or among the agency boards involved. 41 U.S.C. § 7107(d).

*See also*, Hr'g Tr. 43:13 to 94:7 (Aug. 18, 2015) (reciting an example of multiple claims under an indefinite delivery/indefinite quantity contract where a party had appealed most of the claims to the Armed Services Board of Contract Appeals, but the jurisdiction of this court had been properly invoked over one complex claim which happened to have 519 elements) (referring to *Mansoor Int'l Devevlopment Servs. v. United States*, 121 Fed. Cl. 1 (2015).

F.3d at 1360). In *Gillig*, the claim in the second action arose from the "same nucleus of operative fact" as a previously litigated claim, but the later-filed case was based on an assignment of property rights that occurred over a year after the first suit was filed. *Id.* at 1362-63. The court of appeals held that claim preclusion did not apply because the second claim "did not accrue until after [the first case] was filed and was not decided in that first action." *Id.*[22] The Federal Circuit explained that the doctrine of claim preclusion "does not apply to *new rights acquired during the action* which might have been, but which were not, litigated." *Id.* at 1363 (emphasis added) (citation and quotation omitted); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997) ("[Claim preclusion] does not bar litigation of claims arising from transactions which occurred after the [first] action was brought."); *Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*, No. 10 C 715, 2011 WL 3157304, at *5 (N.D. Ill. July 26, 2011) ("While [plaintiff] could have moved for leave of court to amend its pleadings in the 2005 Actions . . . , it was not required to seek such leave to add [an infringement claim for] patents that issued well after the 2005 Actions began.").

The instant case is distinguishable from *Gillig*, in that here the facts pertinent to the government's alternative claim were at hand when the government's contracting officer propounded the first claim. *See* Pl.'s Reply at 9.[23] By December 2008 when the first claim was asserted, the change in accounting methods from 2006 had already occurred and the government was well aware of that change. It was therefore "within the government's control to assert the alternative claim as part of, or contemporaneously with, the [claim for noncompliance]." *Id.* at 10. The government's claim based on the accounting changes from 2006 does not form "an after-acquired claim," *see Gillig*, 602 F.3d at 1363, and its decision to split the claims is fatal to its alternative claim, *see PCL Const. Services*, 84 Fed. Cl. at 415 ("'[I]f the claimant, before filing its first suit, is in possession of all the facts on which its second suit is based, the splitting of the claims into multiple suits is fatal to maintenance of the later-filed action.'") (quoting *Alyeska Pipeline Serv. Co. v. United States*, 231 Ct. Cl. 540, 546 (1982) (in turn quoting *Everett Plywood Corp. v. United States*, 206 Ct. Cl. 244, 252 (1975))).[24]

---

[22]The court of appeals in *Gillig* also held that "to the extent that [the plaintiff] is asserting [a] . . . claim based on a purported 2000 assignment, that claim is, of course, barred, since the district court already found that there was no assignment of rights in 2000." 602 F.3d at 1363.

[23]The other cases that the government cites to are also distinguishable because they involved transactions that occurred after the filing of an earlier lawsuit. *See, e.g., The Baker Group, L.C. v. Burlington Northern And Santa Fe Railroad*, 228 F.3d 883, 886 (8th Cir. 2000) (claim preclusion inapplicable when the expiration of a lease at issue in later-filed claim did not occur until after the first suit was filed); *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1357 (11th Cir. 1998) (claim preclusion inapplicable when "the events giving rise to [the second suit] arose well after [appellant] filed and amended her complaint in the first lawsuit").

[24]The government avers that the "[unilateral] change claim occurred no earlier than May 8, 2011, when Sikorsky refused to provide a cost impact calculation to the United States for Sikorsky's [unilateral] change to Sikorsky's material overhead accounting practice in 2006." Def.'s Surreply at 32; *see infra*, at 18 n.26. In support of its position, the government relies on the Supreme Court's decision in *Crown Coat Front Co. v. United States*, 386 U.S. 503 (1967). *See id.* at 511 (finding that a claim "first accrued . . . upon the completion of the administrative

2. *Jurisdictional limitation.*

The government nevertheless argues that it was permitted to split its claims in this case because this court was without jurisdiction to adjudicate the merits of the alternative claim at the time of Sikorsky's original suit. *See* Def.'s Opp'n at 10-11; *see also* Def.'s Surreply at 2, 12-13. The *Restatement (Second) of Judgments* § 26(1)(c) provides that the usual rules of claim preclusion are inapplicable when a party is "*unable* to rely on a certain theory of the case . . . because of the *limitations on the subject matter jurisdiction of the court[]* . . . .") (emphasis added). *See, e.g., Cunningham v. United States*, 748 F.3d 1172, 1179 (Fed. Cir. 2014) (allowing a claim in a second action because the "court's remedial authority in the first action prevented the [claimant] from seeking the relief sought in the second action"). It is true that "for the court to have jurisdiction under the [Contract Disputes Act], there must be both a valid claim . . . and a contracting officer's final decision on that claim." *James M. Ellett Const. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996). This limiting-jurisdiction argument by the government, however, is based upon the wrong predicate because the government's claims are at issue, not those of Sikorsky, and the government's claims are the jurisdictional drivers.

The CACO's final decision concerning the alternative claim had not yet been made when the government asserted the original claim alleging noncompliance with CAS 418. *See* Def.'s Opp'n at 10. This timing is irrelevant for claim preclusion purposes, however, because it was within the government's control to make all of its claims ripe for review by asserting them before Sikorsky brought suit challenging the first governmental claim. *See Phillips/May*, 524 F.3d at 1271. The government could have relied upon its alternative theory when it originally filed a claim against Sikorsky and could have brought the alternative claim at that time since the salient facts regarding the allocation change in 2006 were already available. To the extent the government is arguing that its hands were tied while it waited for the contracting officer to issue the 2011 final decision, *see* Def.'s Opp'n at 2-3, this argument fails because "*the contracting officer is a government employee* with the responsibility of administering a contract for the contracting agency," *McDonnell Douglas Corp. v. United States*, 76 Fed. Cl. 385, 412 (2007), *aff'd*, 567 F.3d 1340 (Fed. Cir. 2009), *vacated and remanded sub nom. on other grounds*, *Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900 (2011) (emphasis added); *see also* 41 U.S.C. § 7103(a)(3) ("Contracting officer to decide [f]ederal [g]overnment's claims.") (title). "The government cannot use its own contracting officer's delay in asserting a claim to avoid claim preclusion," Pl.'s Reply at 8, because that would allow the government to "re-litigate the same transactional facts by issuing separate, sequenced final decisions on claims arising from those same facts," *id.* at 6.

Any such circumvention of claim preclusion principles "through strategic delay" was rejected by the Federal Circuit in *Phillips/May*, 524 F.3d at 1271. There, a contractor submitted to a contracting officer ten claims against the government that related to its contract for

---

proceedings contemplated and required by the provisions of the contract"). The government's contention is unavailing. It recycles an argument that the government previously made and lost in this court. *See Sikorsky II*, 105 Fed. Cl. at 668-70 (finding that "the adoption of the [Contract Disputes Act] in 1978 vitiated the precedential viability of the *Crown Coat* line of cases in situations where the [Contract Disputes Act] applies").

construction at a naval air station. *Id.* at 1266. The contractor appealed the denial of nine of those claims to the Armed Services Board of Contract Appeals. *Id.* After the parties had entered into a settlement agreement with respect to the nine claims, and the Armed Services Board had issued a judgment in accordance with that agreement, the contractor challenged the tenth claim in this court in a second action. *Id.* at 1267. The government moved for summary judgment, contending that the contractor was barred from litigating the tenth claim by the doctrine of claim preclusion. *Id.* This court granted the government's motion, and on appeal, the contractor argued—as the government does here—that claim preclusion did not apply "because the claims could not have been appealed together." *Id.* at 1270. The court of appeals found this argument untenable:

> Even if [the contractor] were correct that the [tenth claim] could not have been appealed at the same time as the others, *it was within [the contractor's] control to make all ten claims ripe for review at once*. . . . [The contractor] was obligated to prosecute its claims in the same proceeding; it could not avoid the application of [claim preclusion] through strategic delay."

*Id.* at 1271 (emphasis added).[25]

Coupled with *Bowers*, *Phillips/May* is precedentially dispositive. Under the Contract Disputes Act, government contractors and the government stand on equal footing. Claim preclusion principles apply to the government, just as they apply to contractors. *See International Air Response v. United States*, 324 F.3d 1376, 1379-80 (Fed. Cir. 2003) (holding government claims under the Contract Disputes Act barred by *res judicata*). The information used to pursue the alternative claim was already available to the government's contracting officer when he asserted the government's claim alleging noncompliance with CAS 418. Yet, the government's contracting officer waited three years before issuing the alternative claim in the 2011 final decision, and only did so after this court had rejected the government's interpretation of CAS 418 in *Sikorsky IV*, 102 Fed. Cl. 38. It was within the government's control to assert the alternative claim earlier, and its choice to wait does not avoid the application of claim preclusion in this action. *See* Pl.'s Reply at 8 ("Only the government's choice to issue the alternative claim final decision three years after the CAS 418 final decision prevented the joinder of the alternative claim with the CAS 418 claim.").[26] Accordingly, there are no temporal or jurisdictional limitations to save the government's alternative claim from claim preclusion.

---

[25]Notably, in the bill that became the Contract Disputes Act, Congress explicitly rejected a proposed provision that would have allowed claim splitting. *See Phillips/May*, 524 F.3d at 1270 (citing 124 Cong. Rec. S36267 (daily ed. Oct. 12, 1978)).

[26]The government also blames Sikorsky for "delay[ing] the issuance of the [2011] final decision" because Sikorsky did not make its own cost-impact calculation after the government asked for one in March 2011. Def.'s Opp'n at 15-16 (citing Def.'s Opp'n Attachs. A2 (Letter from Elizabeth Alicea to Chancio (Mar. 8, 2011)) & A4 (Reminder Letter from Alicea to Chancio (Apr. 14, 2011))). The effort to shift responsibility is unavailing. The government's contracting officer should have acted three years before the cited request was made to Sikorsky. That the contracting officer could have issued a final decision without the belatedly requested

## CONCLUSION

For the reasons stated, the three elements of claim preclusion have been met, and the government's alternative claim, challenged by Sikorsky in this action, is barred. The government faced no temporal or jurisdictional limitations on bringing its alternative claim with its original claim. Because the government asserted the alternative claim in a later-filed contracting officer's decision, but "*could have* . . . *raised*" that claim in its earlier contracting officer's decision, the alternative claim is now precluded. *Bowers*, 695 F.3d at 1384; *see also Phillips/May*, 524 F.3d at 1271.

The court GRANTS Sikorsky's motion for judgment on the pleadings, and Sikorsky prevails in its suit to overturn the government's alternative claim. The clerk shall enter judgment for Sikorsky and against the government both on the complaint and on the counterclaim.

Sikorsky is awarded its costs of suit.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

calculation is shown by the fact that he actually issued his final decision a few months after making the request, in the absence of a response by Sikorsky. *See* Pl.'s Mot. Ex. A.